1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11                          ----oo0oo----

12  E.T., K.R., C.B., and G.S., by
    their next friend, Frank
13  Dougherty, on their behalf and
    on behalf of all those similarly
14  situated,
                                    2:09-cv-01950 FCD DAD
15          Plaintiffs,

16      v.                          **AMENDED** MEMORANDUM AND ORDER

17  RONALD M. GEORGE, Chair of the
    Judicial Council of California,
18  in his official capacity;
    WILLIAM C. VICKREY,
19  Administrative Director of the
    Administrative Office of the
20  Courts of the Judicial Council,
    in his official capacity; and
21  JAMES M. MIZE, Presiding Judge
    of the Superior Court of the
22  County of Sacramento, in his
    official capacity,
23
            Defendants.
24  _____/

25                          ----oo0oo----

26      This matter is before the court on defendants Ronald M.

27  George, William C. Vickrey, and James M. Mize's (collectively

28  "defendants") motion to abstain and to dismiss the complaint.

Plaintiffs E.T., K.R., C.B., and G.S., by their next friend, Frank Dougherty, (collectively "plaintiffs") oppose the motions. On November 6, 2009, the court heard oral argument on defendants' arguments relating to justiciability.  For the reasons set forth below, defendants' motion to dismiss is GRANTED.

BACKGROUND

This case arises out of plaintiffs' allegations that the caseloads in dependency courts in Sacramento County are so excessive that they violate federal and state constitutional and statutory provisions.  Specifically, plaintiffs contend that the overburdened dependency court system frustrates both the ability of the courts to adjudicate and provide children with a meaningful opportunity to be heard and the effective, adequate, and competent assistance of counsel. (Compl., filed July 16, 2009.)

**A.   Dependency Court Proceedings**

Dependency proceedings are conducted to protect the safety and well-being of an abused or neglected child whose parents or guardians cannot or will not do so or who themselves pose a threat to the child.  (Compl. ¶ 28.)  They commence with an initial hearing, which is held to determine whether a child falls within one of ten jurisdictional bases of the juvenile court. Cal. Welf. & Inst. Code §§ 300, 305, 306, 311, 325 & 332. Dependency courts ultimately conduct an evidentiary hearing regarding the proper disposition of the child.  Id. §§ 319, 352, 355 & 358.  In most cases, at the disposition hearing, dependency courts "determine what services the child and the family need to be reunited and free of court supervision."  Bridget A. v.

2

Superior Court, 148 Cal. App. 4th 285, 302-03 (2d Dist. 2007). However, the courts have a variety of options, from reuniting the family and child to removing the child from parental custody and placing the child in foster care.  See generally id. (outlining court options at disposition hearings).  After a child is placed under court supervision, subsequent court proceedings and reviews are required every six months.  Id.; see Cal. Welf. & Inst. Code §§ 364, 366.21, 366.22.

California Welfare & Institutions Code § 317 requires that counsel be appointed for children in almost all dependency cases. (Compl. ¶ 34.)  Specifically, § 317(c) provides that "[i]f a child is not represented by counsel, the court shall appoint counsel for the child unless the court finds that the child would not benefit from the appointment of counsel."  This finding must be made on the record.  Id.  Pursuant to a Standing Order of the Superior Court of the County of Sacramento, third party, court-appointed attorneys are automatically appointed to represent each child who is the subject of dependency proceedings in the county; these attorneys are also appointed as the child's guardian ad litem.  (Compl. ¶ 50.)

B.   **Functions and Funding within the Dependency Court System**

The Judicial Council of California is the body responsible for overseeing the statewide administration of justice in the California courts.  (Compl. ¶ 9.)  As Chair of the Judicial Council, the Honorable Ronald M. George,[1] defendant, is responsible for the allocation of the judicial branch budget,

---

[1]     The Honorable Ronald M. George is the Chief Justice of the California Supreme Court.

including the allocation of relevant funds for courts and court-appointed child representation in dependency court proceedings. (Id.)  The Administrative Office of the Courts (the "AOC") is the staff agency of the judicial council and is responsible for California's Dependency Representation, Administration, Funding, and Training ("DRAFT") program.  (Compl. ¶ 10.)  DRAFT was established in July 2004 by the Judicial Council of California to centralize the administration of court-appointed counsel services within the AOC.  (Compl. ¶ 55.)  As Administrative Director, defendant William C. Vickrey is responsible for the administration of the AOC.  (Compl. ¶ 10.)  Finally, the Presiding Judge of the Superior Court, the Honorable James M. Mize, defendant, is responsible for allocating resources within the Sacramento County Superior Court in a manner that promotes the implementation of state and local budget priorities and that ensures equal access to justice and the ability of the court to carry out its functions effectively.  (Compl. ¶ 11.)  The Presiding Judge also has the authority to assign judges to departments, such as Sacramento County Superior Court's dependency courts.  (Id.)

The Superior Court of Sacramento previously paid for the court-appointed attorneys' services pursuant to a Memorandum of Understanding.  (Compl. ¶ 55.)  In 2008, however, the Superior Court of Sacramento agreed to participate in the DRAFT program. When Sacramento County joined the DRAFT program, the AOC became responsible for paying for the court-appointed attorneys' services.  (Id.)

Plaintiffs allege that the staff attorneys for the non-profit agency, who serve as court appointed counsel for the approximately 5,100 children subject to dependency proceedings in the County of Sacramento, carry as many as 395 cases at a time. (Compl. ¶ 51.)  Plaintiffs assert this is more than double the 188 caseload standard established by the Judicial Council and nearly four times the number promulgated by the National Association of Counsel for Children.  As a consequence, plaintiffs allege that the appointed lawyers are unable to adequately perform even the minimum tasks required under the law and in accordance with the American Bar Association's ("ABA") standards.  Specifically, these lawyers rarely meet with their child clients in their foster care placements, rely on brief telephone contact or courtroom exchanges to communicate, cannot conduct complete case investigations or child-specific legal analysis, virtually never file extraordinary writs or pursue appeals, and rely on overworked county social workers without conducting an informed review of Child Protective Services' ("CPS") placement decisions.  (Id.)  Further, plaintiffs allege that the high caseload and inadequate salaries of these lawyers lead to high attorney turnover, which exacerbates the problems associated with adequate representation.  (Compl. ¶ 52.) Plaintiffs contend that the court-appointed attorneys' unlawful caseloads are due to inadequate funding and assert that if the AOC had followed its own guidelines for DRAFT in funding the court-appointed attorneys, counsel could have met the recommended Judicial Council caseload standards.  (Compl. ¶ 56.)

Plaintiffs allege that the County of Sacramento has only five judicial referees, who preside over dependency proceedings, responsible for approximately 5,100 active dependency cases. (Compl. ¶ 29.)  Plaintiffs allege that this affords referees roughly two minutes of courtroom time per case.  (<u>Id.</u>) Therefore, plaintiffs contend that a foster child appearing in a Sacramento County dependency court with ineffective counsel cannot reasonably expect the judicial referee to serve as a "backstop" and look out for his or her best interests.  (<u>Id.</u>)

**C.   Named Plaintiffs**

Plaintiff E.T. is a fourteen-year-old girl who is in her third foster care placement in less than one year.  She is a special education student who has been diagnosed with depression. She was assigned a court-appointed attorney in October 2008 and has had two attorneys since then.  (Compl. ¶ 59.)  Although E.T. has had fourteen court hearings, her attorneys have met with her briefly only three times and have visited her at only one placement.  (Compl. ¶¶ 60-61.)  They have been unable to stabilize her foster care placements.  (Compl. ¶ 61.)  Further, they have been unable to investigate her mental health issues to notify the dependency court of any problems.  (Compl. ¶ 62.)

Plaintiff K.R. is a thirteen-year-old girl who is in her fifth foster care placement.  She suffers from severe behavioral problems, including oppositional defiance disorder.  She was assigned a court-appointed attorney in early 1996.  When her case was reopened in September 2005, she was again assigned a court-appointed legal representative.  K.R. has had six attorneys since then.  (Compl. ¶ 63.)  However, although her case has had

6

seventeen court hearings since September 2005, K.R.'s attorneys have not visited any of her foster care placements or had any contact with school personnel. (Compl. ¶ 64.) K.R. has been interviewed only once outside of court, by a social worker, and virtually nothing has been done to investigate K.R.'s interests beyond the scope of the dependency court proceedings. K.R.'s attorneys have been unable to file pleadings, motions, responses, or objections as necessary to protect her interests. Further, they have been unable to stabilize her foster care placements, determine whether she requires public services, or secure a proper educational placement. (Compl. ¶ 65.)

Plaintiff C.B. is a seventeen-year-old, developmentally disabled girl, who is in her tenth foster care placement. She was assigned a court-appointed attorney on February 17, 1999, and she has had ten attorneys over the last ten years. (Compl. ¶ 67.) Her attorneys have not visited her in at least seven of her ten placements. She has had five court and administrative hearings, but her lawyers did not meet with her before the majority of those hearings. (Compl. ¶ 68.) C.B.'s attorneys have been unable to file pleadings, motions, responses or objections as necessary to protect her interests. They have done little to investigate C.B.'s needs and emotional health beyond the scope of the juvenile proceedings or to ensure that she is in a stable foster care placement. (Compl. ¶ 68.) Further, they have failed to ensure compliance with an agreement that C.B. be able to see her sibling, who has been adopted, or to make any effort to meet up with her other adult sibling. (Compl. ¶ 69.) They have also been unable to investigate her educational

7

interests to assess whether her interests need to be protected by the institution or other administrative or judicial proceedings. (Compl. ¶ 70.)   C.B. will "age out" of the foster case system when she turns 18; her attorneys have not had time to assess whether her psychological or developmental issues require that she be allowed to remain in the system until she is 21.   (Compl. ¶ 71.)

G.S. is an eighteen-year-old, emotionally disturbed boy in his tenth foster case placement.   He has had eleven attorneys since he first entered the dependency system on May 3, 2001. (Compl. ¶ 72.)   G.S. has had 28 court and administrative hearings, but his lawyers did not meet him before the majority of those hearings, including the original detention hearing. (Compl. ¶ 73.)   G.S.'s attorneys have been unable to file pleadings, motions, responses or objections as necessary to protect his interests.   They have done little to investigate G.S.'s needs and emotional health beyond the scope of the juvenile proceedings or to ensure that he is in a stable foster placement, including failing to visit him in nine of his ten placements.   (Compl. ¶ 74.)   They have also failed to ensure compliance with court orders, including one that allows him to visit his siblings.   (Compl. ¶ 75.)   Further, his attorneys have not had time to assess whether his psychological issues require that he be allowed to remain in the system until he is 21 or make efforts relating to his potential imminent transition to life outside the foster care system.   (Compl. ¶ 76.)

/////

/////

**D.    The Litigation**

On July 16, 2009, plaintiffs filed suit in this case, by their next friend Frank Dougherty, on behalf of themselves and all others similarly situated, specifically,

> All children currently and hereafter represented by court-appointed counsel in juvenile dependency proceedings in the Sacramento County Superior Court.

(Compl. ¶ 12.)  They assert federal claims under 42 U.S.C. § 1983 arising out of alleged (1) procedural due process violations from excessive attorney caseloads; (2) substantive due process violations from excessive attorney caseloads; (3) procedural due process violations from excessive judicial caseloads; (4) deprivation of rights under the Federal Child Welfare Act ("FCWA"); and (5) deprivation of rights under the Child Abuse Prevention and Treatment and Adoption Reform Act ("CAPTA"). Plaintiffs also assert state law claims arising out of alleged (1) violation of the inalienable right to pursue and obtain safety set forth in Article I, § 1 of the California Constitution for failure to provide fair and adequate tribunals and effective legal counsel; (2) violation of due process as guaranteed in Article I, § 7 of the California Constitution for failure to provide adequate and effective legal representation in dependency proceedings; (3) violation of Welfare and Institutions Code § 317(c); and (4) violation of Welfare and Institutions Code § 317.5(b).

Through this action, plaintiffs seek a declaratory judgment that defendants have violated, continue to violate, and/or will violate plaintiffs' rights as guaranteed by the above constitutions and statutes.  Plaintiffs also seek injunctive

relief, restraining future violations of these rights, and an order "mandating that [d]efendants provide the additional resources required to comply with the Judicial Council of California and the National Association of Counsel for Children's recommended caseloads for each court-appointed attorney." (Prayer for Relief.)

**STANDARD**

Under Federal Rule of Civil Procedure 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. Cruz v. Beto, 405 U.S. 319, 322 (1972). The court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 753 n.6 (1963). A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

1  the reasonable inference that the defendant is liable for the

2  misconduct alleged." Iqbal, 129 S. Ct. at 1949.

3       Nevertheless, the court "need not assume the truth of legal

4  conclusions cast in the form of factual allegations." United

5  States ex rel. Chunie v. Ringrose, 788 F.2d 638, 643 n.2 (9th

6  Cir. 1986).  While Rule 8(a) does not require detailed factual

7  allegations, "it demands more than an unadorned, the defendant-

8  unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949.  A

9  pleading is insufficient if it offers mere "labels and

10 conclusions" or "a formulaic recitation of the elements of a

11 cause of action." Twombly, 550 U.S. at 555; Iqbal, 129 S. Ct. at

12 1950 ("Threadbare recitals of the elements of a cause of action,

13 supported by mere conclusory statements, do not suffice.").

14 Moreover, it is inappropriate to assume that the plaintiff "can

15 prove facts which it has not alleged or that the defendants have

16 violated the . . . laws in ways that have not been alleged."

17 Associated Gen. Contractors of Cal., Inc. v. Cal. State Council

18 of Carpenters, 459 U.S. 519, 526 (1983).

19      Ultimately, the court may not dismiss a complaint in which

20 the plaintiff has alleged "enough facts to state a claim to

21 relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949

22 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570

23 (2007)).  Only where a plaintiff has failed to "nudge [his or

24 her] claims across the line from conceivable to plausible," is

25 the complaint properly dismissed. Id. at 1952.  While the

26 plausibility requirement is not akin to a probability

27 requirement, it demands more than "a sheer possibility that a

28 defendant has acted unlawfully." Id. at 1949.  This plausibility

inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950.

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. <u>See</u> <u>Mir v. Little Co. Of Mary Hospital</u>, 844 F.2d 646, 649 (9th Cir. 1988); <u>Isuzu Motors Ltd. v. Consumers Union of United States, Inc.</u>, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

**ANALYSIS**

Plaintiffs' claims describe critical dependency court system failures, which adversely affect the lives of thousands of children.  The complaint depicts a court system in which the voices of these children are not heard and their stories are not told while important decisions affecting their health and welfare are being made.

While acknowledging the gravity of these issues, defendants assert that such claims are nonjusticiable.  Specifically, defendants assert that "the complaint impermissibly attempts to embroil this court in administration and funding of the dependency courts in the Superior Court of Sacramento County." (Defs.' Mot. to Dismiss, filed Sept. 18, 2009, at 15.) Defendants contend that plaintiffs' claims implicate duties involving state judicial processes that cannot be properly determined by a federal court and plaintiffs seek remedies that cannot be molded without violating established principles of equity, comity, and federalism.

"The judicial power of the United States defined by Art[icle] III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." <u>Valley Forge Christian Coll. v. Americans United For Separation of Church and State, Inc.</u>, 454 U.S. 464, 471 (1982).  Rather, Article III limits "the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'"  <u>Id.</u> at 472 (quoting <u>Flast v. Cohen</u>, 392 U.S. 83, 97 (1968)); <u>Steel Co. v. Citizens For A Better Env't</u>, 523 U.S. 83, 102 (1998).

Cases are thus nonjusticiable when the subject matter of the litigation is inappropriate for federal judicial consideration. <u>Baker v. Carr</u>, 369 U.S. 186, 198 (1962).  In determining whether a case is justiciable, "consideration of the cause is not wholly and immediately foreclosed; rather, the [c]ourt's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."  <u>Id.</u>  "It is the role of the courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.  <u>Lewis v. Casey</u>, 518 U.S. 343, 349 (1996).  These basic concerns are heightened when a lawsuit challenges core activities of *state* responsibility.  <u>Rizzo v. Goode</u>, 423 U.S. 362, 378-79 (1976).

1    "Since the beginning of this country's history Congress has,
2    subject to few exceptions, manifested a desire to permit state
3    courts to try state cases free from interference by federal
4    courts." <u>Younger v. Harris</u>, 401 U.S. 37, 43 (1971).  This desire
5    is premised upon the fundamental and vital role of comity in the
6    formation of this country's government and "perhaps for lack of a
7    better and clearer way to describe it, is referred to by many as
8    'Our Federalism.'"  <u>Id.</u> at 44.  Our Federalism demonstrates "a
9    proper respect for state functions, a recognition of the fact
10   that the entire country is made up of a Union of separate state
11   governments, and a continuance of the belief that the National
12   Government will fare best if the States and their institutions
13   are left free to perform their separate functions in separate
14   ways." <u>Id.</u>  It represents "a system in which there is
15   sensitivity to the legitimate interests of both State and
16   National Governments, and in which the National Government,
17   anxious though it may be to vindicate and protect federal rights
18   and federal interests, always endeavors to do so in ways that
19   will not unduly interfere with the legitimate activities of the
20   States." <u>Id.</u>

21      It is within the context of this foundational concept of
22   comity, which strikes at the heart of the country's governing
23   principles, that the court must view plaintiffs' serious claims.
24   The court is cognizant of the potential hardships inflicted upon
25   one of society's most vulnerable populations if plaintiff's
26   claims are true.  The court is equally cognizant of the profound
27   consequential principles of federalism implicated by this case.
28   Accordingly, it is with careful attention to these two

significant but conflicting interests that the court undertakes its analysis of justiciability pursuant to its equitable discretion and under the principles set forth by <u>Younger v. Harris</u> and its progeny.[2]

## 1.  **Equitable Abstention**[3]

Principles of equity, comity, and federalism preclude equitable intervention when a federal court is asked to enjoin a state court proceeding.  <u>O'Shea v. Littleton</u>, 414 U.S. 488, 499-500 (1974).  The doctrine of equity jurisprudence provides that a "court of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."  <u>Id.</u> at 499.

---

[2]    Defendants also contend that plaintiffs lack standing to bring their claims.  Defendants' arguments relating to abstention and standing relate to whether plaintiffs' claims are properly before the court and within the confines of the judicial authority conferred by Article III.  Indeed, assuming that plaintiffs have sufficiently alleged injury in fact and causation, the court's conclusions relating to its ability to redress such injury, as set forth *infra,* "obviously shade into those determining whether the complaint" sufficiently presents a real case or controversy for purposes of standing.  <u>O'Shea v. Littleton</u>, 414 U.S. 488, 499 (1974).

[3]    While a majority of decisions have applied equitable abstention in the context of cases involving injunctions in criminal cases, the Court has noted that the doctrine "has not been limited to that situation or indeed to a criminal proceeding itself."  <u>Rizzo v. Goode</u>, 423 U.S. 362, 380 (1976).  Rather, the same principles apply to civil proceedings and to cases where injunctive relief is sought against those in charge of an executive branch of an agency of state or local governments.  <u>Id.</u>

The court also notes that while there is significant cross-over between the fundamental principles and factors considered in the doctrines of equitable abstention and <u>Younger</u> abstention, the Supreme Court and Circuit decisions addressing equitable abstention reflect differences that justify separate treatment of these two doctrines.

15

1    The purpose of the doctrine of equitable abstention is to

2  sustain "the special delicacy of the adjustment to be preserved

3  between federal equitable power and State administration of its

4  own law." O'Shea v. Littleton, 414 U.S. 488, 500 (1974)

5  (quotation omitted).  If the equitable relief requested requires

6  intrusive follow-up into state court proceedings, it constitutes

7  "a form of the monitoring of the operation of state court

8  functions that is antipathetic to established principles of

9  comity." Id.  Indeed, the Supreme Court has recently noted that

10 "institutional reform injunctions often raise sensitive federal

11 concerns." Horne v. Flores, 129 S. Ct. 2579, 2593 (2009)

12 (holding that Court of Appeals should have inquired into whether

13 changed conditions satisfied statutory violations that the

14 continuing structural reform injunction was directed to address).

15 These "[f]ederalism concerns are heightened when . . . a federal

16 court decree has the effect of dictating state or local budget

17 priorities.  States and local governments have limited funds.

18 When a federal court orders that money be appropriated for one

19 program, the effect is often to take funds away from other

20 important programs." Horne, 129 S. Ct. at 2593-94.

21    "When the relief sought would require restructuring of state

22 governmental institutions, federal courts will intervene only

23 upon finding a clear constitutional violation, and even then only

24 to the extent necessary to remedy that violation." Los Angeles

25 County Bar Ass'n v. Eu, 979 F.2d 697, 703 (9th Cir. 1992).  Both

26 the First and Fifth Circuits have adjudicated cases relating to

27 overburdened court systems and the substantial delays occasioned

28 by these serious resource allocation problems, and both Circuits

16

have held that the doctrine of equitable abstention barred consideration of the merits of such claims.  In <u>Ad Hoc Committee on Judicial Administration v. Massachusetts</u>, the plaintiffs brought suit against the state, the state legislature, and the governor of Massachusetts to compel the furnishing of additional court facilities.  488 F.2d 1241 (1st Cir. 1973).  The First Circuit noted that the Supreme Court has never found *per se* unconstitutional delay in a civil case; rather, "whether delay is a violation of due process depends on the individual case."  <u>Id.</u> at 1244.  Therefore, the First Circuit held the case was not justiciable because, in order to define the constitutional duty, the court would have to reduce due process into formulae and timetables establishing the maximum permissible delay, which would replace a context specific inquiry into the effect of the delay on the parties, their diligence, the nature of the case, and the interests at stake.  <u>Id.</u>  Similarly, to determine whether that duty was violated, the court would have to extrapolate from statistics, as opposed to considering factors such as discovery, negotiation, investigation, strategy, counsel's engagement on other matters, and even procrastination.  <u>Id.</u> at 1245.

Further, the <u>Ad Hoc Committee</u> court recognized that the relief sought would be unmanageable and outside the scope of the federal judiciary.  Specifically, the First Circuit noted

> a federal judge faced with the awesome task of ordering measures to cut down the waiting period in a state's judiciary could hardly consider merely the augmentation of resources.  He would also have to inquire into the administration of the system, its utilization of personnel, the advisability of requiring adoption of techniques such as pre-trial conferences, different calendar arrangements, split trials, and the like, and countless other administrative matters about which

1  books have been written and courses taught, and as to
2  the relative value of which there remains much dispute.

3  Id.  In essence, the relief requested by the plaintiff would
4  require the court to sit as a receiver over the state court
5  system.  Id. at 1246 (noting that "[w]hile the state judiciary
6  might appreciate additional resources, it would scarcely welcome
7  the intermeddling with its administration which might follow.").
8  Moreover, the court recognized that financing and organization of
9  the federal and state judiciary have been historically "left to
10 the people, through their legislature."  Id.  While, in certain
11 circumstances, courts have ordered a state to furnish certain
12 levels of medical or psychiatric care to those under the states'
13 control, in such cases, the alternative, either explicitly or
14 implicitly, was the closure of noncompliant institutions.  Id. at
15 1246.  Any such implied threat to close down a state court system
16 "would amount to little more than a quixotic and unwarranted
17 intrusion into an entire branch of government."  Id.
18 Accordingly, the court concluded "it would be both unprecedented
19 and unseemly for a federal judge to attempt a reordering of state
20 priorities" as required by the plaintiff's requested injunctive
21 relief.  Id. at 1245-46.  While "[t]he dictates of a federal
22 court might seem to promise easy relief, . . . they would more
23 likely frustrate and delay meaningful reform which, in a system
24 so complex, cannot be dictated from outside but must develop
25 democratically from within the state."  Id. at 1246.

26     Similarly, in Gardner v. Luckey, the Fifth Circuit held that
27 the claims brought by plaintiff "contemplate[d] exactly the sort
28 of intrusive and unworkable supervision of state judicial

18

processes condemned [by the Supreme Court]." 500 F.2d 712, 715
(5th Cir. 1974). The plaintiffs filed a class action against
Florida Public Defender Offices, alleging ineffective assistance
of counsel arising out of inadequate funding and excessive
caseloads. _Id._ at 713. The plaintiffs asked the court to
declare the Offices' caseloads excessive, to specify how
excessive they were, and to enjoin acceptance of overload cases.
_Id._ at 713. The court held that equitable abstention barred suit
because the relief requested would require an ongoing audit of
state criminal proceedings. _Id._ at 715. Further, the court
noted that plaintiffs could file habeas actions to challenge
their custody. _Id._

The Ninth Circuit, however, has held that equitable
abstention did not bar federal jurisdiction in a case for
declaratory relief arising out of delays in the Los Angeles
County Superior Court. _Los Angeles County Bar Ass'n_, 979 F.2d at
703-04. In _Los Angeles County Bar Ass'n_, the plaintiff alleged
constitutional violations of its rights to access the courts and
equal protection arising out a statute that prescribed the number
of judges on the court. The Ninth Circuit distinguished the
First Circuit's decision in _Ad Hoc Committee_ and held that
equitable abstention did not apply to bar federal court
jurisdiction. First, the plaintiff alleged that the _average_ time
to resolution of civil cases in the Los Angeles County Superior
Court was unconstitutional. _Id._ at 703. The Ninth Circuit noted
that this was a less difficult question than that before the
First Circuit, whether a delay was constitutionally acceptable in
any given case. _Id._ Second, _the plaintiff sought only_

*declaratory, not injunctive relief*.  As such, the Ninth Circuit
noted that any order would not directly require supervision of
the state court system by federal judges.   Therefore, the Ninth
Circuit concluded, "although not without some trepidation," that
the claims for declaratory relief were appropriately before it.
Id. at 704.

Judge Kleinfeld, concurring in the decision, which
ultimately dismissed the plaintiff's claims on the merits,
disagreed with the majority's decision regarding equitable
abstention.  Id. at 708-11.  In noting that declaratory judgments
are discretionary, he asserted that a federal court cannot
properly declare a state legislative action regarding the
allocation of judges to be wrong, "where there are no legal
standards to say what number is right."  Id. at 709-10.  Further,
because it would be impossible to derive a standard without
considering (1) "methods of judicial administration within the
state court system," (2) "the receptiveness of the state court
system to various types of claims," (3) "undesirability of delay
in litigation relative to benefits of allocating resources to
other uses," and (4) "many other subtle matters of state policy
which are none of our business," Judge Kleinfeld noted that the
challenge lacked "judicially discoverable and manageable
standards" and required relief based upon resolution of "policy
determinations of a kind clearly for nonjudicial discretion."
Id. at 710.  In short, Judge Kleinfeld asserted that the Ninth
Circuit lacked the power to adjudicate the case and noted,

> The people of the State of California, through their
> system of elected representatives, are entitled in our
> system of federalism to decide how much of their money

1    to put into courts, as well as other activities in
2    which they choose to have their state government
     participate.  The process of deciding how much money to
3    take away from people and transfer to the government,
     and how to allocate it among the departments of
4    government, is traditionally resolved by political
     struggle and compromise, not by some theoretical legal
5    principle.

6  Id.

7        In this case, plaintiffs' challenges to the juvenile

8  dependency court system necessarily require the court to intrude

9  upon the state's administration of its government, and more

10 specifically, its court system.  First, plaintiffs claim that the

11 "crushing and unlawful caseloads" frustrate the ability of the

12 dependency courts to adjudicate cases and "provide children with

13 a meaningful opportunity to be heard." (Compl. ¶ 22)  As such,

14 plaintiffs allege that children subject to dependency proceedings

15 in Sacramento County are denied a fair and adequate tribunal in

16 violation of state and federal law. (Id. ¶ 27.)  At their core,

17 all of plaintiffs' federal and state law claims arising out of

18 these allegations assert that the current judicial caseload is

19 insufficient for the dependency court judges or referees to

20 "consider carefully what has been provided" or to "serve as a

21 backstop and look out for [the child's] best interest."  In order

22 to declare the current caseloads unconstitutional or unlawful,

23 the court would necessarily have to consider, among a host of

24 judicially unmanageable standards, how many cases are

25 constitutionally and/or statutorily permissible, whether each

26 type of case should be weighed evenly, which cases deserve more

27 time or attention, and how much time or attention is

28 constitutionally and/or statutorily permissible.  See Los Angeles

21

County Bar Ass'n, 979 F.2d at 710 (Kleinfeld, concurring).  In
order to attempt to mold an appropriate injunctive remedy to
address the excess caseloads, the court cannot consider only an
augmentation of the dependency court's resources.  Rather, the
court would also have to consider a myriad of administrative
matters that affect the efficiency of the system.  Further, in
order to enforce any method of injunctive relief, the court would
be required to act as a receiver for the Sacramento dependency
court system, ensuring that judges were giving adequate time to
each individualized case pursuant to the constitutional and/or
statutory dictates established through this proceeding.  Such
involvement in any state institutional system is daunting, but
the problems accompanying plaintiffs' requested relief is
increased exponentially when applied to a state judicial system.
See O'Shea, 414 U.S. at 501 (noting that "periodic reporting" of
state judicial officers to a federal court "would constitute a
form of monitoring of state court functions that is antipathetic
to established principles of comity"); see also Ad Hoc Committee,
488 F.2d at 1244-46.

     Second, plaintiffs claim that these overwhelming caseloads
prevent children from receiving "the effective, adequate and
competent assistance of counsel" in violation of state and
federal law.  (Compl. ¶¶ 22, 26.)  Specifically, plaintiffs
allege that the 395 caseload carried by court-appointed counsel
in dependency proceedings render them "unable to adequately
perform even the minimum tasks required of such counsel under law
and in accordance with the American Bar Association's ("ABA")
standards."  (Compl. ¶ 51.)  Similar to plaintiffs' claims

1   regarding excess caseloads in the courts, in order to declare the
2   current attorney caseloads unconstitutional or unlawful, the
3   court would necessarily have to consider through a generalized
4   inquiry how many cases are constitutionally and/or statutorily
5   permissible, whether some types of cases require more
6   investigation or preparation, which types of those cases deserve
7   more resources, and how much time or attention is
8   constitutionally and/or statutorily permissible.  Further, in
9   order to mold a remedy to the injury alleged, the court cannot
10  consider only an increased budget for court appointed dependency
11  counsel.  Rather, the court must consider whether that money
12  should be directed solely at hiring more attorneys, whether more
13  resources need to be directed to support staff or non-legal
14  resources, the need for larger facilities to house more attorneys
15  or staff, and the quality of the staff or attorneys hired.
16  Finally, in order to enforce injunctive relief that is carefully
17  directed to the problems alleged, the court would have to act as
18  an administrative manager of court-appointed dependency counsel
19  to ensure that any additional resources were being implemented
20  appropriately and that counsel was complying with the
21  constitutional and/or statutory guidelines set forth by the
22  court.  See Gardner, 500 F.2d at 714-15.

23      The facts before the court in this case are readily
24  distinguishable from the facts before the Ninth Circuit in Los
25  Angeles County Bar Ass'n and weigh heavily in favor of finding
26  this case nonjusticiable.  In Los Angeles County Bar Ass'n, the
27  Ninth Circuit acknowledged that it would be very difficult for
28  courts to determine how much delay was constitutionally

permissible in any given case, but concluded that the question presented by the plaintiff was whether the *average* time to resolution in a case violated its rights.  979 F.2d at 703. However, in this case, plaintiffs do not allege an *average* amount of time spent on cases by judges or court appointed attorneys to which they object.  Rather, they allege that their constitutional rights have been violated based upon their specific, individual circumstances.  (See Compl. ¶¶ 59-76.)  As such, the case before the <u>Los Angeles County Bar Ass'n</u> court was substantially more manageable than that before the court in this case.

Similarly, in <u>Los Angeles County Bar Ass'n</u>, the plaintiff was a single party challenging the facial constitutionality of a statute due to its alleged harmful effect on the plaintiff's litigation.  Accordingly, the court could undertake a "case-by-case examination" of the merits of the claim by evaluating whether the average delay deprived it of its ability to vindicate important rights.  979 F.2d at 707.  In this case, however, plaintiffs bring claims challenging the practices of a state institution and its officers on behalf of a putative class comprised of all children represented by court-appointed counsel in Sacramento County juvenile dependency proceedings.  An ongoing "case-by-case examination" of such a claim would not be just daunting, but virtually impossible.  Indeed, to fit within the teachings of <u>Los Angeles County Bar Ass'n</u>, the court would have to analyze each of the 5100 juvenile dependency court cases in order to determine whether the lack of time or attention by counsel or the dependency court deprived the minor of the ability

1  to vindicate her rights under the specific circumstances of the
2  case.

3      Finally, the <u>Los Angeles County Bar Ass'n</u> court placed great
4  emphasis on the nature of the relief sought by the plaintiff; it
5  sought only declaratory, not injunctive relief.  While the court
6  noted that it was "not without some trepidation" in exercising
7  declaratory jurisdiction, it stressed that *the relief sought*
8  *would not directly require supervision of the state court system*
9  *by federal judges*.  However, in this case, in addition to
10 declaratory relief, plaintiffs seek injunctive relief that would
11 require the court to act as an administrator and receiver of the
12 Sacramento County dependency court system.  As such, the holding
13 of <u>Los Angeles County Bar Ass'n</u> is inapplicable to the facts
14 before the court in this case.

15     In sum, the claims asserted by plaintiffs and the relief
16 requested strike at the very heart of federalism and the
17 institutional competence of the judiciary to adjudicate state
18 budgetary and policy matters.  Plaintiffs' claims require the
19 court to set constitutional parameters regarding the function of
20 both state judicial officers and state court appointed attorneys.
21 The adjudication of these claims, which seek to evaluate the
22 relationship between caseloads and fair access to justice for
23 children in a variety of situations, requires the implementation
24 of standards that no court has yet to address.  <u>See Los Angeles</u>
25 <u>County Bar Ass'n</u>, 979 F.2d at 706 ("Notwithstanding the
26 fundamental rights of access to the courts, [the plaintiff] does
27 not cite, nor has our independent research revealed, any decision
28 recognizing a right to judicial determination of a civil claim

within a prescribed period of time."); <u>Ad Hoc Committee</u>, 488 F.2d at 1245 ("To extrapolate from court statistics a picture of those cases where inability to obtain a trial has reached due process is difficult."); <u>cf.</u> <u>Caswell v. Califano</u>, 583 F.2d 9, 16-17 (1st Cir. 1978) (holding that where the plaintiffs had a statutory right to hearing within a reasonable time after the request, the district's court imposition of a 90 day period was not an abuse of discretion).  Moreover, in adjudicating whether the Sacramento County dependency courts meet sufficient constitutional standards, there is an implicit threat that the failure to provide constitutionally adequate services would result either in a forced reduction of the number of cases brought on behalf of children or the closure of the court itself.  See <u>Coleman v. Schwarzenegger</u>, No. Civ 90-0520, No. C01-1351, 2009 WL 2430820 (E.D. Cal., N.D. Cal. Aug. 4, 2009) (concluding that the only proper relief for prolonged "woefully and unconstitutionally inadequate" medical and mental healthcare in the California prison system was reduction in the overall prisoner population through prisoner release).  However, any such implied threat "would amount to little more than a quixotic and unwarranted intrusion into an entire branch of state government." <u>Ad Hoc Committee</u>, 488 F.2d at 1246.

The implementation of any injunctive remedy would require an inquiry into the administration of Sacramento County's dependency court system and the court-appointed attorneys with whom it contracts.  It would also require this court to impose it views on the budgeting priorities of the California legislature generally, and specifically on the Judicial Council of California

and the Sacramento Superior Court.[4]  The process of allocating
state resources lends itself to the legislative process where
people have an opportunity to petition the government regarding
how their money should be spent and remove from office those
political officials who act contrary to the wishes of the
majority.  "The judicial process does not share these democratic
virtues." <u>Los Angeles County Bar Ass'n</u>, 979 F.2d at 710
(Kleinfeld, concurring).  If the court granted plaintiffs'
request, it would result in a command to the state to take money
from its citizens, in the form of taxes, or from other
governmental functions, in order to put more money in the
Sacramento County juvenile dependency court system.[5]  While
numerous parties, including the dependency courts would likely
appreciate the influx of resources, such an award, implicating
the balance of budget priorities and state polices, is beyond the
institutional competence of a federal court.  Rather, such
injunctive relief constitutes an "abrasive and unmanageable

---

[4]    Indeed, plaintiffs argue that "[d]efendants spend
hundreds of millions for other priorities even as they assert
poverty when it comes to addressing the caseload-caused anguish
their own meticulous study certifies and decries." (Pls.'s Supp.
Brief [Docket #35], filed Nov. 20, 2009.)  At oral argument,
plaintiff's counsel asserted the AOC spent approximately a
billion and a half dollars on a new management system and has
contracted to build new courthouses, implying that money to fund
relief in this case could be reallocated from those or similar
projects.  (Tr. at 29.)

[5]    Moreover, unless the Superior Court of California were
awarded more judges overall, this court's order would necessarily
implicate state policy decisions regarding how many judges to
appoint in particular departments.

intercession" in state court institutions.[6]  See O'Shea, 414 U.S.
at 504.

     Therefore, the court concludes that principles of equity,
comity, and federalism require the court to equitably abstain
from adjudicating plaintiffs' claims.

     **2.   *Younger* Abstention**

     Generally, the Supreme Court's decision in Younger and its
progeny direct federal courts to abstain from granting injunctive
or declaratory relief that would interfere with pending state
judicial proceedings.  Younger v. Harris, 401 U.S. 37, 40-41
(1971); Samuels v. Mackell, 401 U.S. 66, 73 (1971) (holding that
"where an injunction would be impermissible under these
principles, declaratory relief should ordinarily be denied as
well").  The Younger doctrine "reflects a strong policy against
federal intervention in state judicial processes in the absence
of great and immediate injury to the federal plaintiff."  Moore
v. Sims, 442 U.S. 415, 423 (1979).  When federal courts disrupt a
state court's opportunity to "intelligently mediate federal
constitutional concerns and state interests" and interject
themselves into such disputes, "they prevent the informed
evolution of state policy by state tribunals."  Moore, 442 U.S.
at 429-30.

     While the doctrine was first articulated in the context of
pending state criminal proceedings, the Supreme Court has applied
it to civil proceedings in which important state interests are

_____

     [6]    Further, the court notes, as set forth, *infra*, in the
court's discussion of Younger abstention, plaintiffs have an
alternative, available avenue of relief.

involved.  Id.; see Huffman v. Pursue, Ltd., 420 U.S. 592 (1975).

"The seriousness of federal judicial interference with state

civil functions has long been recognized by the Court. [It has]

consistently required that when federal courts are confronted

with requests for such relief, they should abide by standards of

restraint that go well beyond those of private equity

jurisprudence."  Huffman, 420 U.S. at 603.

Therefore, in the absence of "extraordinary circumstances,"[7]

abstention in favor of state judicial proceedings is required if

the state proceedings (1) are ongoing, (2) implicate important

state interests, and (3) provide the plaintiff an adequate

opportunity to litigate federal claims.  See Middlesex County

Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982);

see San Jose Silicon Valley Chamber of Commerce Political Action

Comm. v. City of San Jose, 546 F.3d 1087, 1092 (9th Cir. 2008)

(noting that where these standards are met, a district court "may

not exercise jurisdiction" and that "there is no discretion in

the district courts to do otherwise").  "Where Younger abstention

is appropriate, a district court cannot refuse to abstain, retain

jurisdiction over the action, and render a decision on the merits

after the state proceedings have ended.  To the contrary, Younger

abstention requires dismissal of the federal action."  Beltran v.

---

[7]     In Moore, the Supreme Court held that dependency
proceedings do not, without more, constitute such an
extraordinary circumstance.  442 U.S. at 434 ("Unless we were to
hold that every attachment issued to protect a child creates
great, immediate, and irreparable harm warranting federal-court
intervention, we are hard pressed to conclude that . . . federal
intervention was warranted.").

1  State of Cal, 871 F.2d 777, 782 (9th Cir. 1988) (emphasis in
2  original).

3      The Supreme Court has held that Younger abstention is
4  appropriately applied to broad challenges to state dependency
5  proceedings.  Moore, 442 U.S. 415.  In Moore, the appellees,
6  husband and wife and their three minor children, sought a
7  declaration that parts of the Texas Family Code
8  unconstitutionally infringed upon family integrity after a
9  juvenile court judge entered an emergency ex parte order that
10 gave temporary custody of the children to the State Department of
11 Public Welfare.  Id. at 419-20.  The appellees moved to terminate
12 the temporary custody.  Id. at 420.  However, instead of moving
13 to expedite the hearing in the county court, requesting an early
14 hearing from state trial or appellate courts, or appealing the
15 temporary order, appellees filed an action challenging the
16 constitutionality of the relevant state statutes in federal
17 court.  Id. at 421.  The Court first concluded that there were
18 ongoing state proceedings, even though not all of the appellee's
19 claims directly related to the custody determination.
20 Specifically, the Court held that the appellee's challenge to the
21 State's computerized collection and dissemination of child-abuse
22 information could be raised in the state court proceedings.  Id.
23 at 424-25.  That the appellee's challenges constituted a
24 "multifaceted" and broad challenge to a state statutory scheme
25 "militated in favor of abstention, not against it."  Id. at 427.
26 Second, the Court concluded that challenges to the state juvenile
27 dependency system implicated an important state concern.  Id. at
28 435 ("Family relations are a traditional area of state

30

concern."). Finally, the Court held that because state procedural law did not bar presentation of the constitutional claims in the dependency court proceedings, the appellees had an adequate state court avenue for relief. In conclusion, the Court noted that it was "unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation." Id. at 435.

**a.   Interference with Ongoing State Proceedings**

Plaintiffs first contend that there are no ongoing state proceedings where plaintiffs' or class members' claims are currently being adjudicated. Specifically, plaintiffs assert that none of the constitutional claims asserted in this action have been asserted in the underlying dependency court cases upon which they are based. Further, plaintiffs contend that the constitutional and statutory claims alleged in this litigation will not interfere with ongoing state proceedings for the purposes of the Younger analysis.

Courts have concluded that continuing state dependency proceedings, which involve the plaintiffs in a federal action that challenges the constitutionality of the services and process received, are "ongoing state proceedings" for purposes of Younger abstention. See 31 Foster Children v. Bush, 329 F.3d 1225, 1275 (11th Cir. 2003); H.C. ex rel. Gordon v. Koppel, 203 F.3d 610, 603 (9th Cir. 2000) (holding that the ongoing proceeding element was satisfied because the plaintiffs' complaint sought "an order requiring procedural due process to be observed in the future course of litigation" of the plaintiffs' pending state custody

proceedings); <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d 1280, 1291

(10th Cir. 1999); <u>Laurie Q. v. Contra Costa County</u>, 304 F. Supp.

2d 1185, 1203 (N.D. Cal. 2004) (holding that challenge to

county's foster care system implicated ongoing dependency court

proceedings); <u>see also</u> <u>Moore</u>, 442 U.S. at 425-27; <u>cf.</u> <u>Lake v.</u>

<u>Speziale</u>, 580 F. Supp. 1318, 1329 (D. Conn. 1984) (holding that

<u>Younger</u> abstention did not apply in the absence of any pending

state court proceeding); <u>Johnson v. Solomon</u>, 484 F. Supp. 278,

295-97 (D. Md. 1979) (same).  However, <u>Younger</u> abstention is only

implicated "when the relief sought in federal court would in some

manner directly 'interfere' with ongoing state judicial

proceedings." <u>Green v. City of Tucson</u>, 255 F.3d 1086, 1097 (9th

Cir. 2001) (en banc) *receded from on other grounds by* <u>Gilbertson</u>

<u>v. Albright</u>, 381 F.3d 965 (9th Cir. 2004).  "The mere potential

for conflict in the results of adjudications is not the kind of

interference that merits federal court abstention." <u>Id.</u>

(internal quotations and citation omitted).  Rather, the system

of dual sovereigns inherently contemplates the possibility of a

"race to judgment." <u>Id.</u> "In order to decide whether the federal

proceeding would interfere with the state proceeding, [courts]

look to the relief requested and the effect it would have on the

state proceedings." <u>31 Foster Children</u>, 329 F.3d at 1276; <u>see</u>

<u>also</u> <u>O'Shea</u>, 414 U.S. at 500 (holding that abstention was proper

where the proposed injunction would indirectly accomplish the

same kind of interference that <u>Younger</u> and subsequent cases

sought to prevent).

     The Eleventh Circuit has held that an action for declaratory

and injunctive relief arising out of challenges to Florida's

foster care system would interfere extensively with the ongoing dependency cases of each plaintiff.  <u>31 Foster Children</u>, 329 F.3d at 1279.  In <u>31 Foster Children</u>, the plaintiffs alleged that the defendants' practices denied and threatened their rights, *inter alia*, to (1) substantive due process for "safe care that meet their basic needs, prompt placements with permanent families, and services extended after their eighteenth birthdays"; (2) "procedural due process in determining the services they will receive"; (3) familial association with their siblings; and (4) prompt placement with permanent families and information provided pursuant to the Adoption Assistance and Child Welfare Act.  <u>Id.</u> at 1261.  The plaintiffs requested that the court declare the defendants' practices unconstitutional and unlawful and grant injunctive relief that would prevent future violations and ensure compliance.  <u>Id.</u>  The Eleventh Circuit held that the declaratory judgment and injunction requested would interfere with the pending state proceedings in numerous ways, including potential conflicting orders regarding what is best for a particular plaintiff, whether a particular placement is safe or appropriate, whether sufficient efforts are being made to find an adoptive family, or whether an amendment needs to be made to a child's plan.  <u>Id.</u> at 1278.  The court concluded that the broad implication of the relief sought was to take the responsibility away from state courts and put it under control of the federal court.  <u>Id.</u> at 1279.  Such action "constitute[d] federal court oversight of state court operations, even if not framed as direct review of state court judgments that is problematic, calling for <u>Younger</u> abstention."  <u>Id.</u>

33

Similarly, the Tenth Circuit has held that declaratory and injunctive relief directed at state institutions involving dependant children warranted abstention because the requested relief would require a supervisory role over the entire state program. J.B. ex rel. Hart v. Valdez, 186 F.3d 1280; see Joseph A. v. Ingram, 275 F.3d 1253 (10th Cir. 2002). In J.B., the plaintiffs, mentally or developmentally disabled children in the custody of New Mexico, alleged constitutional and statutory violations arising out of the failure to provide them with services, benefits, and protections in custody determinations and treatment plans. 186 F.3d at 1282-85. The court held that the federal action would fundamentally change the dispositions and oversight of the children because, by ruling on the lawfulness of the defendant's action, the requested declaratory and injunctive relief would place the federal court in the role of making dispositional decisions in the plaintiff's individual cases that were reserved to the New Mexico Children's Court. Id. at 1292-93. Therefore, the court concluded that, for purposes of Younger abstention, the federal court interfered with the ongoing state court proceedings.

In Joseph A., the Tenth Circuit likewise concluded that Younger abstention was implicated by the broad relief implicated by a consent decree relating to the procedures to be accorded children in the state's custody. 275 F.3d 1253. The plaintiffs, children in New Mexico's custody due to abuse or neglect, and the New Mexico Department of Human Services had entered into a federal court consent decree, and the plaintiffs subsequently moved the court to hold the Department in contempt for allegedly

1   violating that consent decree.  Id. at 1257.  The court held that

2   enforcement of the consent decree would require "interference

3   with the operations of the Children's Court in an insidious way,"

4   in that the consent decree operated like that of an injunction or

5   declaratory judgment that precluded the presentation of certain

6   options to the Children's Court.  Id. at 1268-69.  Further, the

7   consent decree's restrictions were ongoing, impacting the conduct

8   of the proceedings themselves, not just the body charged with

9   initiating the proceedings.  Id. at 1269.  Accordingly, the court

10  concluded that "Younger governs whenever the requested relief

11  would interfere with the state court's ability to conduct

12  proceedings, regardless of whether the relief targets the conduct

13  of the proceeding directly."  Id. at 1272.

14      In this case, plaintiffs seek a declaration that the

15  judicial and attorney caseloads are so excessive that they

16  constitute a violation of constitutional and statutory rights.

17  In their complaint, plaintiffs request that defendants be

18  enjoined from currently and continually violating their

19  constitutional and statutory rights and that defendants provide

20  additional resources to reach recommended caseloads for

21  attorneys.  At oral argument, plaintiffs clarified that they also

22  sought the appointment of more judges in order to ease judicial

23  caseloads.  (Tr. at 31.)

24      Plaintiffs contend that at this stage of the litigation, the

25  court need not contemplate the precise remedy available to

26  plaintiffs if they prevail on the merits; rather the court should

27  presume that it is possible to "issue an order that avoids

28  Younger and conforms to the Court's sound discretion and proof at

35

1  trial." (Pls.' Opp'n at 23.)  However, this contention runs

2  counter to the Court's explanation of the appropriate inquiry

3  regarding justiciability as set forth in O'Shea:

4        [T]he question arises of how compliance might be
        enforced if the beneficiaries of the injunction were to
5        charge that it had been disobeyed.  Presumably any
        member of respondent's class who appeared . . . before
6        petitioners could allege and have adjudicated a claim
        that petitioner's were in contempt of the federal
7        court's injunction order, with a review of an adverse
        decision in the Court of Appeals and, perhaps in [the
8        Supreme Court].

9  414 U.S. at 501-02.  Further, in evaluating whether Younger

10  abstention applied to the plaintiffs' challenges to the adequacy

11  of Georgia's indigent court system, the Eleventh Circuit looked

12  to the Supreme Court's analysis in O'Shea, and reasoned that

13  consideration of the remedies available is necessary at the

14  outset of the litigation because "[i]t would certainly create an

15  awkward moment if, at the end of protracted litigation, a

16  compliance problem arose which would force abstention on the same

17  ground that existed prior to trial." Luckey v. Miller, 976 F.2d

18  673, 679 (11th Cir. 1991).  The court agrees.

19      The relief requested by plaintiffs in this case would

20  necessarily interfere with their ongoing dependency court cases

21  and those of the putative class.  The requested declaratory

22  relief calls into question the validity of every decision made in

23  pending and future dependency court cases before the resolution

24  of this litigation.  Specifically, plaintiffs seek a finding that

25  the number of lawyers currently provided are insufficient to

26  perform the enumerated duties that they are required to perform

27  under both state and federal law.  Plaintiffs similarly seek a

28  finding that they have not been granted meaningful access to the

36

courts or appropriate consideration of their matters due to
judicial caseloads.  While plaintiffs contend that each
individual plaintiff would still have to demonstrate prejudice in
order to invalidate the decision rendered in each pending case,[8]
the court cannot overlook the practical impact of the proposed
declaratory relief on the *5,100 active dependency court cases*;
this court's order would substantiate a finding of a
constitutional or statutory violation in every one of those
active cases.  Even if not determinative in every instance, this
finding would impact each of the putative class member's cases.
See Luckey, 976 F.2d at 679 ("[L]aying the groundwork for a
future request for more detailed relief which would violate the
comity principles expressed in Younger and O'Shea is the precise
exercise forbidden under the abstention doctrine."); Gardner, 500
F.2d at 714 (noting that abstention was applicable to the
plaintiffs' challenges to operation of the Florida state public
defender offices "to the extent the complaint alleged present and
continuing constitutional deprivations due to the representation
appellants were receiving in pending state appeals proceedings");
see also Kaufman v. Kaye, 466 F.3d 83, 86-87 (2d Cir. 2006)
(holding that requested declaratory relief in challenged
assignment procedures in New York court system interfered with
ongoing administration of the court system because the court

---

[8]      The court notes that plaintiffs' contention is
incongruous with their allegations and arguments relating to
injury.  The named minor plaintiffs allege that the excessive
judicial and attorney caseloads prevented them from receiving
services or process.  A finding in favor of the named plaintiffs
would directly affect the proceedings of those plaintiffs.

1  could not resolve the issues raised without resolving the same

2  issues as to the subsequent remedy chosen by the state).

3       Further, the broad and ill-defined injunctive relief

4  requested by plaintiffs would impact the conduct of the

5  proceeding themselves, not just the body charged with initiating

6  the proceedings.  See Joseph A., 275 F.3d at 1269.  If the court

7  finds constitutional or statutory violations based upon the

8  amount of time or resources spent on juvenile dependency court

9  cases, an injunction directed to remedying those violations would

10  require the court to ensure that in each case the child was

11  receiving certain services or procedures that the court has

12  declared constitutional.  Enforcement could not simply end with a

13  policy directive to the Judicial Council, the AOC, or the

14  Sacramento Superior Court, but would require monitoring of its

15  administration.

16       Indeed, plaintiff contemplates such relief, as illustrated

17  by their submission of a consent decree in a Northern District of

18  Georgia case, Kenny A. v. Perdue, which they contend demonstrates

19  a "straightforward, easily enforceable" remedy.  (Pls.'

20  Supplemental Opp'n, filed Nov. 22, 2009, at 4.)  Specifically,

21  the proffered consent decree requires that defendants ensure that

22  Child Advocate Attorneys have a maximum caseload and that the

23  County will hire a specified number of additional attorneys

24  within certain time periods.  (Ex. A. to Decl. of Jonathan M.

25  Cohen ("Consent Decree"), filed Nov. 20, 2009, at 3-4.)  The

26  decree also requires that defendants provide documents and

27  information to a "Compliance Agent" regarding the caseload and

28  number of attorneys, training and CLE records for those

attorneys, performance reviews and evaluations for those
attorneys, and complaints of inadequate and ineffective legal
representation.  (<u>Id.</u> at 4-5.)  The appointed "Compliance Agent"
is then responsible for undertaking an independent fact-finding
review of the parties' obligations, issuing a "Compliance
Report," and reviewing or reporting any curative plans.  (<u>Id.</u> at
6.)  The Compliance Report must then be filed in federal court.
(<u>Id.</u> at 7.)  Pursuant to certain requirements, the parties could
challenge non-compliance and seek enforcement of the decree in
federal court.  (<u>Id.</u> at 8-9.)

        The court disagrees with plaintiffs' characterization that
such a decree is straightfoward and easily enforceable.  First,
the court has grave concerns about both the effectiveness and the
enforceability of the relief accorded.  In this case, plaintiffs
allege violations arising from excessive caseloads of both
attorneys and judicial officers/judges and request injunctive
relief aimed at both of these problems.  An order providing for
the allocation of more attorneys and judges to the dependency
court system and maximum caseloads presumes that such measures
would redress the problems of inadequate representation as
alleged in the complaint, which ignores other issues of
administrative efficiencies, resource management, and possible
physical contraints that are implicated by plaintiffs' claims.
However, *assuming arguendo*, that plaintiffs could support this
presumption through proof, the question remains how the court
would enforce such an order.  Should the court order that court-
appointed representation cannot be granted if attorney caseloads
exceed the mandated maximum?  Should the court suspend dependency

1 court proceedings until defendants are able to hire adequately
2 trained attorneys to represent children in these proceedings?
3 Should the court order that dependency court judicial
4 officers/judges simply should decline to hear cases that would
5 require them to exceed their maximum caseload?  If state courts
6 refuse to comply with the court's maximum caseload requirements,
7 should the federal court impose sanctions on the state court
8 judge or officials for contempt?  Would the court hold the Chair
9 of the Judicial Council or the Presiding Judge of the Superior
10 Court of Sacramento County in contempt for noncompliance due to
11 state budgetary limitations?[9]  These questions necessarily
12 implicate the importance of the state's interest in adjudicating
13 these matters and the ability of the court to enforce its own
14 orders without violating well-established principles of
15 federalism and comity.  See Joseph A., 275 F.3d at 1267-72
16 (holding that litigation to enforce consent decree raised Younger
17 abstention issues); see also Laurie Q., 304 F. Supp. 2d at 1204-
18 05 (holding that in order to cure the juvenile court's alleged
19 failure to review case plans in a timely fashion, the court would
20 be compelled "to either spur the Juvenile court by injunction, or
21 even take the matter completely out of its hands" and thus,
22 engage in the type of interference criticized by the Ninth
23 Circuit in City of Tucson, 255 F.3d 965).

24      Second, the proffered periodic reporting requirements,
25 standing alone, "constitute a form of monitoring of the operation

26

27          [9]    See Luckey, 976 F.2d at 679 ("Avoidance of this
    unseemly conflict between state and federal judges is one reason
28 for O'Shea and Younger.")

40

of state court functions that is antipathetic to established

principles of comity." O'Shea, 414 U.S. at 501.  The Supreme

Court has explicitly disapproved of an injunction aimed at

controlling or preventing the occurrence of specific events in

future state proceedings because it would require "the continuous

supervision by the federal court over the conduct [of defendants]

in the course of future . . . proceedings involving any members

of the . . . broadly defined class." Id.  While the reporting

requirements may not impose an undue burden in their creation,

the underlying question is whether a federal court should order

such reports at all.  See Luckey, 976 F.2d at 678 n.4; see also

Anthony v. Council, 316 F.3d 412, 421 (3d Cir. 2003) (abstaining

under Younger where federal relief would disrupt the New Jersey

court system and lead to federal monitoring).  The principles

underlying both O'Shea and Younger persuade the court that it

should not.

        Further, the court finds plaintiffs' reliance on the

reasoning of Kenny A. unpersuasive.  See 218 F.R.D. 277.  As an

initial matter, the facts considered by the Kenny A. court

relating to interference with ongoing state proceeding are

different from the facts that must be considered by the court in

this case.  In Kenny A., nine foster children in the custody of

the Georgia Department of Human Resources filed a putative class

action in state court against the Governor of Georgia, the

Georgia Department of Human Resources and its Commissioner, the

counties' Department of Family and Children Services and their

Directors, and the counties.  218 F.R.D. at 283-84.  Defendants

removed the case to federal court, where they asserted that the

court should refrain from exercising jurisdiction pursuant to
Younger.  Id. at 284-85.  The court held that defendants waived
their right to raise Younger abstention by removing the case to
federal court; accordingly, the court's cursory analysis of the
applicability of Younger abstention is merely dicta.  Id. at 285.
However, the court reasoned that the federal action would not
interfere with the juvenile proceedings because the declaratory
and injunctive relief was not directed at the plaintiffs' review
hearings, at Georgia's juvenile courts, juvenile court judges, or
juvenile court personnel.  Id. at 286.  Rather, the court
emphasized that plaintiffs' alleged violations arose out of the
(1) excessive numbers of cases assigned to inadequately trained
and poorly supervised case workers (not lawyers); (2) failure to
identify and develop a sufficient number of foster homes; (3)
failure to identify adult relatives who could care for
plaintiffs; (4) failure to provide relevant information and
support services to foster parents; (5) failure to develop
administrative controls; (6)  failure to provide timely and
appropriate permanency planning; (7) placement in dangerous,
unsanitary, and inappropriate homes; (8) failure to provide
appropriate mental health, medical, and educational services; and
(9) separation of teenage mothers in foster care from their own
children.  Id.  The court held that remedying these failures
would not interfere in any way with ongoing juvenile court
proceedings.  Id.

    Conversely, in this case, plaintiffs' claims are directed at
the fairness and efficacy of the dependency courts and counsel
arising out of excessive caseloads.  As such, unlike the court's

42

characterization of the claims in <u>Kenny A.</u>, plaintiffs' requested
declaratory and injunctive relief is directed at the plaintiffs'
review hearings, Sacramento County's juvenile courts, juvenile
court judges, and juvenile court personnel.  <u>See</u> <u>Joseph A.</u>, 275
F.3d at 1272 (noting that injunctive relief directed at
attorneys, rather than at the court directly, does not preclude
<u>Younger</u>'s application because the same underlying principles
apply to officers of the court).

     Moreover, the court notes that the <u>Kenny A.</u> court's analysis
failed to address issues that the Supreme Court and other Circuit
courts have found important to the applicability of the first
element of <u>Younger</u> abstention.  Specifically, while the <u>Kenny A.</u>
court noted that plaintiffs challenged excessive caseloads in its
analysis of whether there was an adequate opportunity to raise
federal claims, the court notably omitted this allegation from
its analysis of potential interference with state court
proceedings.  <u>See</u> <u>id.</u> at 286-89.  The court's focus on
non-lawyers and non-judicial actors in the determination of
whether the federal court would interfere with on-going state
proceedings avoided a pivotal issue of whether an analysis of the
constitutionality and lawfulness of allegedly excessive caseloads
would interfere with ongoing state court proceedings.  <u>See</u>
<u>Luckey</u>, 976 F.2d at 679.

     In sum, the court concludes that the declaratory and
injunctive relief requested by plaintiffs severely interferes
with the operation of state court proceedings.  Any declaratory
relief necessarily implicates the validity of pending dependency
court proceedings, even if such findings are not wholly

1 | determinative.  Further, the requested injunctive relief would be
2 | impossible to enforce without violation of established principles
3 | of federalism and comity.  Accordingly, the first element of
4 | <u>Younger</u> abstention is present in this case.

5 |     **b.**  **Important State Interests**

6 |   The parties do not dispute that this litigation implicates
7 | important state interests in the care, placement, and welfare of
8 | children in the Sacramento County dependency court system.
9 | Indeed, the law is clear that "[f]amily relations are a
10 | traditional area of state concern."  <u>Moore</u>, 442 U.S. at 435.
11 | Further, "[p]roceedings necessary for the vindication of
12 | important state policies or for the functioning of the state
13 | judicial system . . . evidence the state's substantial interest
14 | in the litigation."  <u>Middlesex County Ethics Comm.</u>, 457 U.S. at
15 | 432.  Accordingly, the second element of <u>Younger</u> abstention is
16 | present in this case.

17 |     **c.**  **Adequate Opportunity to Present Federal Claims**

18 |   Plaintiffs contend that there is no adequate opportunity to
19 | present their federal claims in the pending state court
20 | dependency proceedings.  Specifically, plaintiffs contend that
21 | they "would be unable to get a fair hearing in state court
22 | because the [d]efendants employ the state court judges." (Pls.'
23 | Opp'n at 21).  Plaintiffs also contend that, as a practical
24 | matter, they cannot press their constitutional claims in
25 | dependency court because the system is overburdened.

26 |   "Minimal respect for state processes, of course, precludes
27 | any *presumption* that the state court will not safeguard federal
28 | constitutional rights."  <u>Middlesex County Ethics Comm.</u>, 457 U.S.

at 431.   Rather, a federal court "should assume that state
procedures will afford an adequate remedy, in the absence of
unambiguous authority to the contrary."  Pennzoil Co. v. Texaco,
Inc., 481 U.S. 1, 15 (1987).   As such, a plaintiff opposing
abstention bears the burden of establishing that the pending
state proceedings do not provide an adequate remedy for their
federal claims.   31 Foster Children, 329 F.3d at 1279.

"Where vital state interests are involved, a federal court
should abstain 'unless state law clearly bars the interposition
of the constitutional claims.'"  Middlesex County Ethics Comm.,
457 U.S. at 423 (quoting Moore, 442 U.S. at 423); Hirsh v.
Justices of Supreme Court of Cal., 67 F.3d 708, 713 (9th Cir.
1995) ("Judicial review is inadequate *only* when state procedural
law *bars* presentation of the federal claims.").   "The pertinent
inquiry is whether the state proceedings afford an adequate
opportunity to raise the constitutional claims."  Id. (internal
quotations omitted).   A federal court "should not exert
jurisdiction if the plaintiffs 'had an *opportunity* to present
their federal claims in the state proceedings.'"  Id. at 425
(quoting Juidice v. Vail, 430 U.S. 327, 337 (1977)) (emphasis in
original).   The fact that judicial review is discretionary or
that the claims may be raised only in state court review of
administrative proceedings does not amount to a procedural bar.
Hirsh, 67 F.3d at 713 (discretionary judicial review of the Bar
Court's decision provided adequate opportunity for judicial
review); Beltran, 871 F.2d at 783 (state appellate court review
of the Agricultural Labor Relations Board's decision provided
adequate opportunity to raise constitutional claim).

45

California courts have explicitly held that juvenile courts can hear constitutional claims relating to the deficient representation of counsel arising out of the unavailability of adequate time and resources to represent a minor.  In re. Edward S., 173 Cal. App. 4th 387, 407-10 (1st Dist. 2009); see In re Darlice C., 105 Cal. App. 4th 459, 463 (3d Dist. 2003) ("Where, as here, the juvenile court has ordered parental rights terminated, a parent has the right to seek review of claims of incompetent assistance of counsel."); Laurie Q., 304 F. Supp. 2d at 1206 ("California law has conferred upon the Juvenile Court the sweeping power to address nearly any type of deficiency in the care of a minor and order nearly any type of relief.").  Indeed, at least one California court has noted, that it is the "paramount responsibility of a judicial officer to assure the provision of a fair trial" and that a continuance of pending proceedings or other adequate relief is justified where there is "an adequate showing that an [attorney's] excessive caseload and the limited resources [available to him] made it impossible . . . to adequately represent" his client.  Id.; see also 31 Foster Children, 329 F.3d at 1279 (holding that available remedies were adequate because the juvenile court can act to protect children within its jurisdiction); J.B., 186 F.3d at 1292-93 (holding that because the juvenile court was a court of general jurisdiction under state law, the plaintiffs had not provided "unambiguous authority" that state courts could not provide an adequate remedy); Joseph A., 275 F.3d at 1274 (holding that dismissal of a federal claim in dicta from a state court opinion was

46

insufficient to overcome the presumption that state relief was available).

In this case, plaintiffs have failed to overcome the presumption that their pending state court proceedings provide an adequate opportunity for judicial review of their federal claims. Rather, California law explicitly provides recourse through the state court system for the federal claims raised in this litigation.  At oral argument, plaintiffs conceded that the state dependency courts can entertain the type of federal claims brought in this litigation.  (Tr. of Nov. 6, 2009 Hr'g ("Tr.") at 43.)  Further, under California law, one of the paramount responsibilities of state judicial officers is the assurance that parties are provided with a fair trial.  Therefore, plaintiffs have an alternative adequate opportunity to press their federal claims.

Plaintiff's reliance on the D.C. Circuit's decision in LaShawn A. v. Kelly, is misplaced.  990 F.2d 1319 (D.C. Cir. 1993.)  In LaShawn A., the plaintiffs brought a child welfare class action against the defendants based upon alleged constitutional and statutory violations arising from "ineptness and indifference, inordinate caseloads, and insufficient funds." Id. at 1320.  In rejecting the applicability of Younger abstention, the court noted that the District of Columbia Family Division had "explicitly rejected the use of review hearings to adjudge claims requesting broad-based injunctive relief based on federal law."  Id. at 1323.  Accordingly, there was no alternative avenue for relief for the plaintiffs.  However, as set forth above, in this case it is undisputed that state courts

can entertain the type of federal claims brought in this litigation.  As such, there is no procedural bar as was before the LaShawn A. court.[10]

Accordingly, the third element of Younger abstention is met in this case.

### d.   Exceptions to Abstention

Finally, plaintiffs contend that abstention is unwarranted because the judicial state officer or other state judge responsible for deciding their claims "would be placed in the position of having to rule against either the Honorable Presiding Judge in their own County or against the remaining [d]efendants . . . who establish policy governing their jobs.  (Pls.' Opp'n at 28.)

---

[10]   Plaintiffs' reliance on Kenny A. is similarly misplaced as the Northern District of Georgia explicitly found that the juvenile court lacked the power to grant the relief requested by the plaintiffs.  218 F.R.D. at 287.  Further, the Kenny A. court's alternative rationale, that the plaintiffs "are dependent upon an allegedly overburdened and inadequate system of legal representation, which prevents them from raising their claims in the juvenile court," is contrary to Ninth Circuit precedent, which, as set forth above, provides that judicial review is inadequate "only where there is a procedural bar to the presentation of federal claims.  See Hirsh, 67 F.3d at 713.

The court is not dispassionate regarding the obstacles facing plaintiffs.  However, their arguments regarding the practical impediments to judicial review run counter to explicit Supreme Court and Ninth Circuit authority on this issue.  See Pennzoil, 481 U.S. at 15 ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."); Hirsh, 67 F.3d at 713.  Neither the Supreme Court nor the Ninth Circuit has held that practical impediments may amount to a procedural bar for purposes of Younger abstention; nor did the Kenny A. court cite any legal authority for its novel rationale.  218 F.R.D. at 287.

"Although a federal court is normally required to abstain if the three prongs of the Younger test are satisfied, abstention is inappropriate in the 'extraordinary circumstance' that the state tribunal is incompetent by reason of bias." Hirsh, 67 F. 3d at 713 (citing Gibson v. Berryhill, 411 U.S. 564, 577-79 (1973)). "Bias exists were a court has prejudged, or reasonably appears to have prejudged, an issue." Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir. 1992).

The party alleging bias "must overcome a presumption of honesty and integrity in those serving as adjudicators." Hirsh, 67 F.3d at 714. (internal quotations and citations omitted). Where there is an absence of any personal or financial stake in the outcome sufficient to create a conflict of interest and where there is a lack of personal animosity towards the parties in the proceedings, the presumption is not overcome. Vanelli v. Reynolds Sch. Dist. No. 7, 667 F.2d 773, 779-80 n.10 (9th Cir. 1982). The Supreme Court has held that a plaintiff did not sufficiently demonstrate bias when a state medical board adjudicated the merits of a disciplinary action in which the board itself investigated and filed charges. Withrow v. Larken, 421 U.S. 35, 47 (1975). The Court has also concluded that a state board's prior involvement in a labor dispute with striking teachers did not prevent it from deciding whether those teachers should be dismissed as a result of that unlawful strike. Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 497 (1976); see also Vanelli, 667 F.3d at 779-80 (holding that a school board reviewing its own prior decision was not impermissibly biased). Similarly the Ninth Circuit has held

that judges are not incompetent to review findings of judicial
officers whom they participate in appointing.  <u>Hirsch</u>, 67 F.3d at
714.  The Ninth Circuit has also held that fines imposed by a
disciplinary board, which are paid to the same entity that pays
the salaries of the disciplinary board, is insufficient to
establish bias.  <u>Id.</u>

Plaintiffs' conclusory and astonishing assertions that *all*
state court judges are biased in this matter is unsupported by
law or facts.  Plaintiffs have not submitted any allegations or
argument that all state court judges and judicial officers have a
personal or financial stake in the litigation.  Nor have
plaintiffs proffered any allegations or arguments relating to any
judge's personal animosity against them.  While plaintiffs
contend, without any legal authority for support, that defendants
control policy decisions that may impact state judges, such a
broad and ambiguous contention does not come close to surpassing
the factual circumstances in which the Ninth Circuit has held the
presumption of bias was not overcome.  As such, plaintiffs'
conclusory assertions are insufficient to demonstrate
extraordinary circumstances.

Therefore, because plaintiffs' claims would interfere with
ongoing state dependency court proceedings that implicate
important state interests, plaintiffs have an adequate
opportunity to pursue their federal claims in those proceedings,
and they have failed to overcome the presumption of honesty and
integrity in those serving as adjudicators, the court must
abstain from adjudicating these claims pursuant to <u>Younger v.
Harris</u>.

50

1                              **CONCLUSION**

2           In conclusion, the court again acknowledges that plaintiffs'

3   claims present a troubling depiction of the state of Sacramento

4   County's dependency court system.   The facts alleged relative to

5   the named minor plaintiffs demonstrate a serious lack of

6   responsiveness by the state's current system to the needs of

7   children.   However, to remedy these wrongs, this court must

8   reallocate state financial resources, reorder state legislative

9   priorities, and revise state judicial policies.   This proposed

10  federal judicial takeover of these functions of state government

11  not only strikes at the core principles of federalism and comity,

12  but assumes an institutional competence that a federal district

13  court simply does not possess.

14          Therefore, for the foregoing reasons, defendants' motion to

15  dismiss is GRANTED.

16          IT IS SO ORDERED.

17  DATED: January 11, 2010

18                                 _____

19                                 FRANK C. DAMRELL, JR.
                                   UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

                                    51